

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

TH:MWG/SMS/IC
F. #2024R00654

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 23, 2025

By ECF and E-Mail

The Honorable Ramon E. Reyes, Jr.
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   United States v. Ernest Aiello, et al.
      Criminal Docket No. 25-314 (RER)

Dear Judge Reyes:

        The government respectfully submits this letter in advance of the arraignments of the defendants in the above-referenced case. For the reasons discussed below, the government respectfully requests that the Court enter orders of detention as to defendants ERNEST AIELLO, LOUIS APICELLA, AMMAR AWAWDEH, MATTHEW DADDINO, ERIC EARNEST, LEE FAMA, THOMAS GELARDO, ZHEN HU, JOSEPH LANNI, NICHOLAS MINUCCI, ANGELO RUGGIERO, JR., ROBERT STROUD, and JULIUS ZILIANI, and that the Court should not release NELSON ALVAREZ, SAUL BECHER, CHAUNCEY BILLUPS, JOHN GALLO, MARCO GARZON, JAMIE GILET, TONY GOODSON, KENNY HAN, SHANE HENNEN, OSMAN HOTI, HORATIO HU, DAMON JONES, JOHN MAZZOLA, CURTIS MEEKS, MICHAEL RENZULLI, ANTHONY SHNAYDERMAN, SETH TRUSTMAN, and SOPHIA WEI absent a substantial bail package to assure their appearance in court and the safety of other persons and the community.

        As set forth below, this case involves a complex scheme to rig illegal poker games using wireless cheating technology in the Eastern District of New York and other locations across the United States. Participants in the scheme included game organizers, who arranged for unwitting victims to play in the underground poker games; suppliers of the rigged technology; former professional athletes, who were enlisted in the scheme to entice the victims' participation in the games; money launderers; and members and associates of the Bonanno, Gambino, and Genovese organized crime families of La Cosa Nostra ("LCN"), who backed games in the New York area and took a percentage of the criminal proceeds from those games. LCN members and associates had a foothold in the rigged poker scheme because they had preexisting control over "straight" (*i.e.*, non-rigged) poker games in and around New York City,

where some of the rigged poker games also occurred. One was hosted principally at 147 Lexington Avenue in Manhattan and was on record with the Bonanno family (the "Lexington Avenue Game"). Another was hosted principally at 80 Washington Place in Manhattan and was on record with the Gambino family (the "Washington Place Game"). As part of the scheme, some of the charged defendants and other co-conspirators also committed acts of violence, including the robbery and extortions charged in the Indictment, as well as additional acts of violence described below.

Given the nature of the crimes charged, the serious penalties that all defendants face upon conviction, the strong evidence of guilt, and the risk that defendants—particularly inducted members of LCN—will obstruct or attempt to obstruct justice, the government respectfully submits that defendants AIELLO, APICELLA, AWAWDEH, DADDINO, EARNEST, FAMA, GELARDO, ZHEN HU, LANNI, MINUCCI, RUGGIERO, STROUD, and ZILIANI be detained pending trial. Defendants ALVAREZ, BECHER, BILLUPS, GALLO, GARZON, GILET, GOODSON, HAN, HENNEN, HOTI, HORATIO HU, JONES, MAZZOLA, MEEKS, RENZULLI, SHNAYDERMAN, TRUSTMAN, and WEI should be released only upon the imposition and satisfaction of appropriate conditions to ensure that they do not flee, attempt to obstruct justice, or commit additional crimes.

I.    Background

A.    The Offense Conduct

The government proffers the following facts concerning the offense conduct. *See United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (holding that the government may proceed by proffer in a detention hearing); *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995) (same); *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (same).

The proof in the case includes, among other things, (1) witness testimony; (2) text messages, photographs, videos, audio recordings, and other materials recovered from cellular telephones and iCloud accounts of the defendants and their co-conspirators; and (3) financial records.

1.    Overview of the Rigged Poker Scheme

Beginning as early as 2019, defendant STROUD and others began orchestrating a scheme to use wireless cheating technology to run rigged poker games (most commonly, Texas Hold'em) across the United States, including in the Hamptons, Manhattan, Las Vegas, and Miami. In a typical unmanipulated, or "straight," poker game, the dealer used an automatic shuffling machine to shuffle the cards randomly before dealing them to all the players in a particular order. In the rigged games, by contrast, the defendants and their co-conspirators used shuffling machines that had been secretly altered to use concealed technology to read the cards in the deck, predict which player at the table had the best poker hand, and relay that information via

interstate wires to an off-site operator.[1]  The off-site operator then relayed the information via cellphone back to a member of the conspiracy who was playing at the table, referred to as the "Quarterback" or "Driver."  The Quarterback then secretly signaled this information (usually by prearranged signals like touching certain chips or other items on the table) to other co-conspirators playing at the table, who were also participants in the scheme.  Collectively, the Quarterback and other players in on the scheme (*i.e.*, the cheating team) then used this information to win poker games against unwitting victims, who sometimes lost tens or hundreds of thousands of dollars at a time.

At times, defendants and their co-conspirators used other cheating technology, including a poker chip tray analyzer which secretly read cards using hidden cameras.  The scheme otherwise worked the same way.  In addition, members of the conspiracy sometimes used other methods to cheat, such as an x-ray table that could read cards face down on the table, and special contact lenses or eyeglasses that could read pre-marked cards.

Below are representative images of the cheating technology employed by the conspirators:



*Image of a DeckMate 2 shuffler taken apart on a table,
from defendant HENNEN's iCloud account*

---

[1]     In many cases, the rigged shuffling machines were modified versions of the DeckMate 1 and DeckMate 2 shuffling machines.



*Image of the computer program showing information transmitted
by the rigged shuffling machine, from defendant HENNEN's iCloud account*



*Image of an x-ray poker table, from defendant STROUD's iCloud account*

Members of the conspiracy fulfilled different roles to ensure the scheme's success:

- STROUD, GOODSON, HENNEN, and MEEKS supplied the cheating technology.

- Game organizers—including STROUD, AWAWDEH, BECHER, GALLO, ZHEN HU, and TRUSTMAN—arranged for the games and brought in unwitting victims (often referred to as "whales" or "fish") to play in underground poker games.

- Cheating teams participated in the rigged games, either as the dealer, "Quarterback," or another participant who received the Quarterback's signals and played accordingly. Members of the cheating teams included STROUD, ALVAREZ, APICELLA, BILLUPS, EARNEST, GARZON, GILET, GOODSON, HAN, HENNEN, HORATIO HU, JONES, MAZZOLA, MINUCCI, RENZULLI, RUGGIERO, TRUSTMAN, and WEI. BILLUPS and JONES, in particular, served as "Face Cards," meaning they were utilized to attract victims to the games because of their status as former professional athletes.

- SHNAYDERMAN, among others, laundered the proceeds of the fraud. For example, game organizers sometimes instructed victims to send money via bank wires to shell companies controlled by SHNAYDERMAN. SHNAYDERMAN, in turn, transferred money (either in cash or cryptocurrency), less a money laundering fee, back to the game organizers.

As a representative example, in September 2024, defendants ALVAREZ, GOODSON, GILET, HAN, MAZZOLA and RENZULLI organized and participated in rigged poker games in Miami, Florida. The defendants defrauded John Doe #4 of at least $60,000 using an altered shuffling machine. In the below message, defendant MAZZOLA sent STROUD and GOODSON the following list of players for the rigged Miami game:



"Gee" refers to defendant NELSON ALVAREZ, also known as "Spanish G"; "Mikey" refers to defendant MICHAEL RENZULLI; "Mazz" refers to defendant JOHN MAZZOLA; "Tone" refers to defendant TONY GOODSON; "Kenny" refers to defendant KENNY HAN; "Lil Robbie" refers to defendant ROBERT STROUD; and "Jamie Friend" refers to defendant JAMIE GILET. In addition, the list also refers to John Doe #4 (number nine, and name redacted above), whom defendant MAZZOLA identified as the "fish," the name by which the defendants often referred to their victims.

MAZZOLA also sent defendants STROUD and GOODSON the list of signals that would be used at the table during the rigged Miami game, shown below:



For example, the above text message indicated that if defendant RENZULLI ("Mikey") had the best hand, the Quarterback (in this case, MAZZOLA) would touch the $1,000 poker chip; if defendant ALVAREZ ("G") had the best hand, the Quarterback would tap his chin; if defendant MAZZOLA ("Mazz") had the best hand, he would tap his wrist or arm. If the victim had the best hand, the Quarterback would touch his black chips, in which case the conspirators would fold to avoid losing money to the victim.

Members of the conspiracy frequently texted about the scheme in real time. At times, they tried to coordinate how to lose purposefully on occasion to keep the victim at the table for longer, or to avoid suspicion of cheating. One example is shown below in messages between defendants RENZULLI ("Big Mikey") and ALVAREZ ("Gstacks Gee Stacks"), in a group chat that also included HAN, MAZZOLA, and STROUD:



These messages related to the same games in Miami, Florida, during which John Doe #4 was defrauded.

As another example, as described in the Indictment, in April 2019, defendants BILLUPS, EARNEST, GILET, STROUD, and WEI organized and participated in rigged poker games in Las Vegas, Nevada, using a rigged shuffling machine provided by defendant STROUD. The defendants defrauded victims of at least $50,000. Below are examples of text messages sent between defendants STROUD and WEI during the games, in which they discussed the participation of defendants BILLUPS and EARNEST, and the need to lose purposefully on occasion to avoid suspicion of cheating:



In these messages, WEI expressed concern that EARNEST ("Spook") and BILLUPS ("Chauncey") had won too many improbable hands ("hit 2 gutshot on the river against the same guy"), which would arouse suspicions of cheating. WEI then recommended that they put another member of the cheating team ("the middle eastern guy") at the table so that BILLUPS and EARNEST could lose purposefully to him to deflect suspicion away from them. STROUD agreed, and WEI confirmed that "they already know all the signals."

As the messages reflect, STROUD noted that one of the victims had "acted like he wanted Chauncey to have his money" because he was "star struck" by BILLUPS—a former star basketball player. This was by design, as STROUD recruited former professional athletes,

7

including defendants BILLUPS and DAMON JONES, into the conspiracy to lure wealthy victims into playing in the games.  For their role as "Face Cards" and members of the cheating teams, STROUD paid them a portion of the criminal proceeds.

For instance, following another rigged game in late October 2020 in which BILLUPS participated, bank records show that STROUD (through his company Lil Robbie Productions LLC) wired WEI $50,000, who, in turn, wired the $50,000 directly to BILLUPS.

In connection with a rigged game in East Hampton, New York, that defrauded John Does #2 and #3, defendant JONES asked STROUD for payment even before the game started, as reflected in the text message below:

> **Dee Jones**
>
> Hey Rob can u send one of those wires on ur phone? I don't know how much the job pays tomorrow but can I get a 10k advance on it?? GOD really blessed me that u have action for me cause I needed it today bad
>
> Read: 9/19/2023 9:48:59 PM(UTC+0)

In response to this message, STROUD sent $2,500 to JONES via Zelle the same day.  Three days later, messages show that defendant GOODSON ("Tony in Macon") coached JONES in real time on how to cheat by instructing him to pay attention to defendants AWAWDEH (whom he likened to NBA All-Star Stephen "Steph" Curry) and GARZON (whom he compared to NBA All-Star Lebron "Bron" James), and, in case of doubt, to fold his hand:

> **Tony In Macon**
>
> Remember if you have to think hard about a call ...just fold
>
> D, watch Ammar he's the Steph ALSO WATCH MARCO  he's the Bron (does it all)
>
> 9/22/2023 9:43:05 PM(UTC+0)

> **Dee Jones**
>
> Lol man y'all call Djones in cause y'all know I know what I'm doing!!
> Let me hibachi like Gilbert Arenas
>
> ☐ 9/22/2023 10:11:06 PM(UTC+0)

In response, defendant JONES confirmed that he knew how to participate in the rigged poker scheme: "y'all know I know what I'm doing!!"

2.     <u>The Involvement of Organized Crime</u>

The game organizers often made use of preexisting illegal gambling operations and the personnel of those operations to run the rigged games. When defendants BECHER, ZHEN HU, and TRUSTMAN joined the rigged poker conspiracy, they had already been operating the Lexington Avenue Game with the backing of the Bonanno organized crime family. Thus, BECHER, ZHEN HU, and TRUSTMAN used many of the same locations and personnel to operate their rigged games, and they were required to make payments to the Bonanno family for the games (rigged or straight) that they operated. In particular, defendant ZILIANI, who is an inducted member of the Bonanno family, and defendant GELARDO, an associate of the Bonanno family at the time, supervised the Lexington Avenue Game and took a portion of its criminal proceeds. Defendant AIELLO, a high-ranking member of the Bonanno crime family, did not typically visit the gambling location itself but received proceeds from the rigged and non-rigged games.

Below are photographs taken by law enforcement showing the presence of defendants BECHER, GELARDO, HOTI (who provided security for the game), ZHEN HU, TRUSTMAN, and ZILIANI in the immediate vicinity of 147 Lexington Avenue:

  

*HOTI and TRUSTMAN*        *ZHEN HU*        *BECHER*
*May 31, 2023*        *May 31, 2023*        *May 31, 2023*

  

*GELARDO and TRUSTMAN*
*August 14, 2023*

*TRUSTMAN and ZILIANI*
*August 16, 2023*

*ZILIANI*
*August 16, 2023*

Similarly, when defendants AWAWDEH and GALLO joined the rigged poker scheme, they had already been operating the Washington Place Game with the backing of the Gambino organized crime family, including defendants FAMA, LANNI, and RUGGIERO. Defendant DADDINO, a member of the Genovese organized crime family, also participated in the management of the 80 Washington Place Game. Thus, defendants AWAWDEH and GALLO used many of the same locations and personnel to operate the rigged games, and they were required to make payments to the Gambino family for the games (rigged or straight) that they operated. In a text message with defendant HENNEN in July 2023, which was recovered from HENNEN's iCloud account, defendant AWAWDEH ( "Flappy") confirmed that his game was backed by the Gambino crime family:



In 2023, the Lexington Avenue Game and the Washington Place Game merged, and they operated jointly to conduct rigged games using technology supplied by defendants STROUD and others. As a result of the merger, the Bonanno and Gambino families agreed that

they would each take a percentage of the proceeds of the poker games—both rigged and non-rigged.  For example, in the following text message from defendant ZHEN HU (using the alias "Jonathan Chan") to TRUSTMAN on September 21, 2023, ZHEN HU reported that he had spoken with defendant JOHN GALLO (a Gambino associate) about sending money, and that defendant JULIUS ZILIANI ("J," a Bonanno member) said to send the money to defendant LEE FAMA ("Lee," a Gambino member):

> **Jonathan Chan**
>
> John called me to shoot the shit. Then asked when I'm sending the money. I told him J said to send to Lee
>
> 9/21/2023 7:01:37 PM(UTC+0)

This message related to the proceeds of the rigged games in June and July 2023 that defrauded John Doe #1 of approximately $1.8 million, which is described in the Indictment.

Defendants ZILIANI and FAMA would meet regularly at Sally's Bar, a bar one block away from the Lexington Avenue Game, in furtherance of the joint venture to profit from the rigged poker scheme.  Below, for example, is a surveillance photograph of defendants ZILIANI and FAMA talking together at Sally's Bar on the evening of Wednesday,[2] October 4, 2023:



*ZILIANI and FAMA at Sally's Bar*
*October 4, 2023*

### 3.    Acts of Violence in Furtherance of the Conspiracy

Members of the conspiracy committed violent acts, including assault, extortions, and robbery, in furtherance of the scheme to ensure the repayment of debts and continued success of the operation.

---

[2]    The Lexington Avenue Game hosted weekly illegal poker games on Wednesdays.

a.    <u>Extortion of John Doe #5 (Count Five)</u>

As charged in Count Five of the Indictment, in or about November 2022, ZHEN HU assaulted John Doe #5, a poker player, for not paying him a gambling debt.  On November 5, 2022, ZHEN HU sent the following threats to John Doe #5:



In the days that followed, ZHEN HU punched John Doe #5, which ZHEN HU confirmed in another text message sent to another individual on November 9, 2022:



Later, ZHEN HU, ZILIANI, GELARDO, and other individuals went to 80 Washington Place and demanded to see John Doe #5.  John Doe #5 eventually came outside, and GELARDO assaulted John Doe #5 again, as confirmed by the below text messages from John Doe #5 to ZHEN HU almost a year later referencing sending "a bunch of goons to solve your problems":



b.    Robbery of John Doe #7 (Count Six)

As charged in Count Six of the Indictment, defendants AWAWDEH, HOTI, MAZZOLA, MINUCCI, and STROUD plotted to rob a rigged shuffling machine from John Doe #7 in September 2023.  The robbery was successful in the early morning hours of September 7, 2023.

Specifically, STROUD learned that John Doe #7, who was also involved in the operation of rigged poker games, had a rigged version of the DeckMate 1 shuffler,[3] and he plotted with others to rob it from John Doe #7 at gunpoint.

In the early morning hours of September 7, 2023, John Doe #7 was in a car with HOTI and MAZZOLA when two individuals recruited by MINUCCI approached the car, brandished a gun, and demanded the "box" from John Doe #7.  At the time of the robbery, HOTI, who was driving the car and in on the scheme along with MAZZOLA, kept the car in park and did not drive away.  John Doe #7 turned over the rigged shuffling machine to MINUCCI and the gunmen.

Evidence of the robbery includes text messages, pole camera footage, and license plate reader information showing that cars registered to MINUCCI and HOTI participated in the robbery.  For example, on September 6, 2023 (the day before the robbery), GOODSON sent STROUD a photograph of John Doe #7 at the airport, apparently confirming that John Doe #7 had arrived in New York.  At approximately 12:31 a.m. on September 7, pole camera footage showed MINUCCI's car arrive at Lexington Avenue.  At the same time, HOTI texted AWAWDEH: "Nick is here do i let him up," to which AWAWDEH replied: "Tell him I'm coming down."

After the robbery, HENNEN and AWAWDEH exchanged the following messages about how AWAWDEH had participated in the robbery of the Deckmate 1 ("DM1"):

---

[3]    An unaltered, commercially-available DeckMate shuffler retailed for over $10,000.



Finally, the day after the robbery, STROUD texted MINUCCI to arrange a meeting:



Several hours later, STROUD texted defendant MATTHEW DADDINO:



c.    <u>Extortion of John Doe #6 (Count Seven)</u>

As charged in Count Seven of the Indictment, on or about September and October 2023, BECHER, ZHEN HU, and TRUSTMAN extorted John Doe #6 based on John Doe #6's prolonged inability to repay a $10,000 poker debt. BECHER, ZHEN HU, and TRUSTMAN discussed the debt in a group chat with GALLO and AWAWDEH in early September 2023. Later that month, John Doe #6 texted ZHEN HU that he was "so sick" with a "Major flu" that he was hospitalized. ZHEN HU forwarded this text message to BECHER and TRUSTMAN and then wrote about John Doe #6 (whom he called "fucko"):



On October 18, 2023, BECHER, ZHEN HU, and TRUSTMAN continued to discuss John Doe #6's debt, including how they expected John Doe #6 to make a payment after TRUSTMAN threatened him:





Given that TRUSTMAN reported to GELARDO and ZILIANI, TRUSTMAN apparently threatened John Doe #6 by invoking his connections with organized crime ("who the numbers are with").

The threats worked. The same date as these messages, October 18, 2023, John Doe #6 texted TRUSTMAN to tell him that he would be arriving in a "Black rover" with a "5k ck personnel [*sic*]," and that he would do another "5k" by "transfer w Saul." Surveillance video from outside 147 Lexington Avenue shows that John Doe #6 did, in fact, arrive at the location in a Black Range Rover and handed something to a woman outside the location. And ZHEN HU saved on his cellphone a photograph of a check dated October 18, 2023, from John Doe #6 in the amount of $5,000. The payee was left blank, and the memo line stated: "Poker."

d.    Violence at 80 Washington Place on October 11, 2023

As noted above, the Lexington Avenue Game and Washington Place Game merged in 2023, with the Bonanno and Gambino families both receiving a cut of the proceeds from rigged poker games. However, in the fall 2023, AWAWDEH restarted his own competing poker game at 80 Washington Place on the same night as the Lexington Avenue Game. In response, on the night of October 11, 2023, GELARDO, ZILIANI, and others stormed 80 Washington Place with weapons. ZILIANI was armed with a gun, and GELARDO was armed with a baton. They entered 80 Washington Place while a poker game was ongoing and assaulted AWAWDEH. A brawl broke out, and GELARDO and ZILIANI left the location.

Afterward, GELARDO messaged ZHEN HU with the demand that they cease contact with AWAWDEH and his partners:

> There is to be no more contact with any of them u a.k.a. hear me do not reply or answer fucking Bruce John Ammar and tell Saul the same. I don't wanna hear different.
>
> 5m

4.    <u>Money Laundering (Count Four)</u>

Finally, the investigation has revealed that the defendants laundered the proceeds of their scheme, with defendant SHNAYDERMAN acting as the principal money launderer. SHNAYDERMAN laundered the money from various shell companies and through cryptocurrency.  As just one example, following the successful fraudulent rigged game against John Doe #1, bank records show that ZHEN HU sent $100,000 to one of SHNAYDERMAN's front companies on August 4, 2023, in exchange for cash.  The same day, SHNAYDERMAN texted ZHEN HU about how he could receive $97,000 in cash from an intermediary:





Based on this and other similar instances of money laundering, it appears that SHNAYDERMAN has quick access to large amounts of cash that he supplied to co-conspirators to help them launder the proceeds of their crimes.

B.    <u>Summary of the Counts Against Each Defendant</u>

On October 9, 2025, a grand jury in this district returned the Indictment, which charges the defendants with various crimes related to their participation in the illegal gambling and rigged poker schemes.  The chart in Appendix A sets forth the crimes charged against each defendant, as well as the government's position as to detention for each defendant.

II.    <u>Legal Standard</u>

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, if a judicial officer determines that release on a defendant's own recognizance "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community, such judicial officer shall order the pretrial release of the person . . . subject to the least restrictive further condition, or combination of conditions, that such judicial officer determines will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(c)(1).

Federal courts are also empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). In deciding whether to detain a defendant, a court "must undertake a two-step inquiry." *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice." *Id.* "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." *Id.* If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001).

The Bail Reform Act lists four factors to be considered "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community": (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's "financial resources," "past conduct," and "criminal history," and "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. *See* 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

III.    <u>Argument</u>

    A.    <u>Defendants AIELLO, APICELLA, AWAWDEH, DADDINO, EARNEST, FAMA, GELARDO, ZHEN HU, LANNI, MINUCCI, RUGGIERO, STROUD, and ZILIANI Should Be Detained</u>

As a threshold matter, defendants AWAWDEH, GELARDO, ZHEN HU, MINUCCI, STROUD, and ZILIANI are eligible for detention because they are each charged with a "crime of violence"—namely, either Hobbs Act robbery conspiracy or Hobbs Act extortion conspiracy. *See* 18 U.S.C. § 3142(f)(1)(A); *United States v. Santora*, 225 F. App'x 21, 22 (2d Cir. 2007) (affirming detention order based on district court's finding that defendant had "committed a crime of violence, specifically conspiracy to commit extortion"); *United States*

*v. Chimurenga*, 760 F.2d 400, 404 (2d Cir. 1985) (holding that Hobbs Act robbery conspiracy qualifies as a "crime of violence" for purposes of § 3142(f)(1)(A)).[4]

In addition, as explained below, defendants AIELLO, DADDINO, FAMA, LANNI, RUGGIERO, and ZILIANI (collectively, the "LCN-Member Defendants") each pose "a serious risk" that they will "obstruct or attempt to obstruct justice," 18 U.S.C. § 3142(f)(2)(B), as inducted members in organized crime families. Indeed, as noted below, defendant RUGGIERO has previously been convicting of threatening to kill a witness in furtherance of the Gambino family. Given their close affiliations with organized crime and stated propensities for violence, defendants APICELLA and GELARDO similarly pose a serious risk that they will attempt to obstruct justice if released on bail. *Id.*

Defendant EARNEST is a demonstrated, serious risk of flight because, as described below, he has a serious criminal history and committed the crimes charged less than two months after serving a substantial term in federal prison, while just beginning his term of supervised release. 18 U.S.C. § 3142(f)(2)(A).

      1.      The Nature and Circumstances of the Crimes Charged,
               the Weight of the Evidence, and the Serious Penalties Counsel
               Strongly in Favor of Detention for These Defendants

At the outset, the nature and circumstances of the crimes charged is serious. The wire fraud scheme here was extensive in its geographic scope, number of participants, number of victims, and the amount of harm caused. The charged wire fraud scheme, as set forth in the Indictment, also involved the threat of violence by members and associates of organized crime in order for the scheme to function. The rigged games in New York operated with the express approval of members and associates of multiple organized crime families, and it was understood that the organized crime families both provided protection for the games and would ensure the collection of gambling debts when necessary. Indeed, poker players in New York generally played on credit, meaning they did not have to pay or put up money before playing, but were required to pay what they owed after the game. This meant that debt collection was an important component of the scheme, and organized crime families—with their reputation for violence— helped to ensure that players paid their gambling debts. It is well-established that defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely that they will commit even non-violent crimes that are detrimental to the community. *See,*

---

[4]      The Second Circuit has made clear that *United States v. Davis*, 588 U.S. 445 (2019), and its progeny have no impact on the definition of "crime of violence" under the Bail Reform Act. *See, e.g.*, *United States v. Watkins*, 940 F.3d 152, 167 (2d Cir. 2019) (holding that the "residual clause" in the Bail Reform Act's definition of "crime of violence," 18 U.S.C. § 3156(a)(4)(B), "is not unconstitutionally vague" because the Bail Reform Act "does not define criminal offenses, fix penalties, or implicate the dual concerns [of fair notice and preventing arbitrary enforcement] underlying the void-for-vagueness doctrine"); *see also United States v. Bush*, No. 18-CR-00907-PAC, 2021 WL 371782, at *2 (S.D.N.Y. Feb. 3, 2021), *appeal dismissed sub nom. United States v. Johnson*, No. 21-199, 2021 WL 1811527 (2d Cir. May 4, 2021).

*e.g.*, *United States v. DiSano*, No. 18-CR-337-3 (WFK), 2018 WL 11191538, at *2 (E.D.N.Y. Dec. 14, 2018) ("Defendants pose a danger to the community not only when they commit acts of violence, but also when it is likely they will commit non-violent acts that are detrimental to the community.").

Second, the weight of the evidence against each defendant is extremely strong. It includes, among other things, financial records, cellphone extractions, witness testimony, the contents of Apple iCloud accounts, telephone records, cellphone location information, and surveillance photographs. Where, as here, the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." *United States v. Zhang*, 55 F.4th 141, 151 (2d Cir. 2022); *United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007) (finding detention appropriate because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); *United States v. Bruno*, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee.").

Finally, the defendants face serious penalties, which give the defendants an incentive to flee and to obstruct justice. *See, e.g.*, *Zhang*, 55 F.4th at 151 ("The prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence."); *United States v. Williams*, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding that an estimated Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); *United States v. Dodge*, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (holding that the possibility of a "severe sentence" heightens the risk of flight). For the wire fraud conspiracy alone, with which all defendants except LANNI are charged, there is a maximum possible penalty of twenty years' imprisonment, and an estimated Guidelines range of imprisonment of at least 70-87 months' imprisonment.[5]

## 2.   The LCN-Member Defendants Should Be Detained

In addition to the above, the history and characteristics of each of the LCN-Member Defendants weighs strongly in favor of detention. As a general matter, with respect to the LCN-Member Defendants, the Court should consider that each of those defendants has taken a lifetime oath to commit crimes and put their crime families above all else. Those crime families have a long history of committing crimes, including obstruction of justice. As the court held in *United States v. Defede*, in ordering the detention of the acting boss of the Luchese family, the argument for detention in these circumstances is reasonably based "on the inference that a person in [the defendant's] position is quite likely to engage in dangerous conduct—just as one reasonably could infer that one holding the position of major league baseball pitcher is entirely likely to hurl a small white object in the direction of home plate." 7 F. Supp. 2d 390,

---

[5]     The government's estimate is based on a Criminal History Category I (some defendants are higher), a base offense level of 7, U.S.S.G. § 2B1.1(a)(1), an 18-level increase based on the loss amount, *id.* § 2B1.1(b)(1)(J), and a 2-level increase for sophisticated means, *id.* § 2B1.1(b)(10). This estimate is preliminary and may change as the government continues its investigation.

392 n.4 (S.D.N.Y. 1998). Accordingly, these defendants pose a distinct threat to commit additional crimes if released on bail. *See, e.g.*, *United States v. Salerno*, 631 F. Supp. 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

In particular, the Second Circuit has rejected significant bail packages for members and associates of organized crime families in a variety of contexts. *See, e.g., Ferranti*, 66 F.3d at 543; *United States v. Orena*, 986 F.2d 628, 630 & 632 (2d Cir. 1993) (rejecting $1 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); *United States v. DiSano*, No. 18-CR-337-3 (WFK), 2018 WL 11191538, at *3 (E.D.N.Y. Dec. 14, 2018).

In addition to their general membership in organized crime families, the Court should consider the following facts in determining that the nature and characteristics of the LCN-Member Defendants weigh in favor of detention:

*AIELLO*. AIELLO is an inducted high-ranking member of the Bonanno organized crime family. AIELLO received criminal proceeds from the charged fraud scheme in his capacity as a leader of the Bonanno family. His leadership position within the Bonanno family gives him a unique ability to direct others to commit crimes, which makes him a particular danger to the community, such that detention is warranted. *See United States v. Bellomo*, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996) (noting that "the leader of a criminal enterprise with the ability to order members of that enterprise to engage in criminal actions may be a danger to the community despite the lack of evidence that he directly participated in many, if any, of the charged crimes.").

Further, AIELLO has three prior felony convictions. In 2017, AIELLO pleaded guilty to promoting gambling in the first degree, in violation of New York Penal Law § 225.10(1), and was sentenced to an indeterminate term of two-to-four years' imprisonment. AIELLO also has prior convictions for attempted criminal possession of a loaded firearm in the third degree, in violation of New York Penal Law § 265.02(4), in 2003 and attempted assault in the second degree, in violation of New York Penal Law § 120.05, in 2002.

*DADDINO*. DADDINO is an inducted member of the Genovese crime family.

*FAMA*. FAMA is an inducted member of the Gambino crime family, and he has three prior felony convictions. In 2012, FAMA pleaded guilty to distribution of marijuana, in violation of 21 U.S.C. §§ 841 and 841(b)(1)(D), and was sentenced to six months' imprisonment in this District. *See United States v. Fama*, No. 12-CR-726 (DLI) (E.D.N.Y.). Previously, FAMA was convicted of assault in-aid-of racketeering, in violation of 18 U.S.C. § 1959, in the Southern District of New York, for which he was sentenced to 58 months' imprisonment. *See United States v. Fama, et al.*, No. 95-CR-840 (S.D.N.Y.). He also has prior conviction for criminal sale of a controlled substance in the second degree, in violation of New York Penal Law § 220.41 in 1987.

*LANNI.*  LANNI is an inducted member of the Gambino crime family and holds a leadership position within the family, which gives him a unique ability to direct others to commit crimes and makes him a particular danger to the community.  *See Bellomo*, 944 F. Supp. at 1166. Further, described above, LANNI has multiple prior felony convictions.  In 1999, he was convicted of securities fraud in this District and sentenced principally to thirty months' imprisonment.  In 2014, he was convicted of promotion of gambling in the first degree, a felony in violation of New York Penal Law § 225.10(1), for which he was sentenced to one year's imprisonment.

Further, just last week, on October 17, 2025, LANNI pleaded guilty to one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), before the Honorable Frederic Block in this District.  This crime related to LANNI's role as a captain in the Gambino family. LANNI is pending sentencing in that case.  *See United States v. Lanni, et al.*, No. 23-CR-443 (FB) (E.D.N.Y.).  LANNI has demonstrated that he will not comply with pretrial release conditions; while on pretrial release in that case, LANNI was in communication with Gambino associates, including Frank Isoldi,[6] in violation of pretrial conditions not to communicate with members and associations of LCN.  Given LANNI's leadership position, LANNI's continued communications with Gambino associates is particularly concerning given LANNI's ability to order others to engage in criminal acts.

In addition to his prior federal criminal convictions, LANNI has a history of involvement in attempts to intimidate witnesses.  For example, on one occasion, in February 2021, two of LANNI's co-defendants in Case No. 23-CR-443, James LaForte and Vincent Minsquero, assaulted a person, who they believed had previously provided information to law enforcement about members and associates of organized crime, while LANNI sat nearby.  That evening, the assault victim, his girlfriend, and their friends went to Sei Less, a restaurant near West 38th Street and Broadway in Manhattan.  According to witnesses, while the group was waiting to pay their bill, LaForte and Minsquero approached their table.  LaForte called the assault victim a "rat" and hit the victim in the face with a bottle.  LaForte and Minsquero also flipped the victim's table, sending drinks and shattered glass everywhere.

LANNI has also engaged in uncharged acts of violence that counsels strongly in favor of detention.  For example, on September 1, 2023, LANNI and Minsquero caused a disturbance at Roxy's Bar and Grille, a restaurant in Toms River, New Jersey, and threatened the owner of the restaurant (the "Owner") and the Owner's spouse (the "Spouse").  The Owner and the Spouse were working at the restaurant on September 1, 2023.  The Owner was introduced to LANNI and Minsquero earlier that day by the bartender who was serving them, and the Owner learned LANNI's name to be Joe. At approximately 8:15 p.m. that evening, LANNI and Minsquero got into an argument with another patron that led the restaurant's staff to ask them to leave.  While being escorted out of the restaurant, both LANNI and Minsquero became belligerent.  Minsquero damaged a painting and punched a wall, and LANNI told the Owner, in substance, that he would "burn this place down with you in it."  LANNI referred to himself as a

---

[6]    Frank Isoldi was previously convicted of conspiring to engage in the extortionate collection of credit with made Gambino member George Lombardozzi.  *See United States v. Lombardozzi*, 491 F.3d 61, 67 (2d Cir. 2007).

"Gambino" around this time.  A member of the restaurant's staff called the Toms River Police Department, who responded to the restaurant and told LANNI and Minsquero not to return. LANNI and Minsquero left.

Video footage from a gas station across the street from Roxy's Bar and Grille shows LANNI and Minsquero at the gas station approximately 18 minutes after the above-described incident.  The video shows LANNI—minutes after threatening to burn down the restaurant—purchasing a red gas container, walking to a pump, and trying briefly to fill the container with gas before apparently being dissuaded by Minsquero and a gas station attendant. The video then shows Minsquero reentering the gas station and returning the gas container (while LANNI attempted to physically prevent him from doing so).

Telephone records show that, after being told to leave, LANNI called Roxy's Bar and Grille approximately 39 times between September 1, 2023, and September 2, 2023. At approximately 9:41 p.m., body-worn camera video from a Toms River police officer shows the Owner on the phone with LANNI and saying, "Stop calling my business," as the officer approached.  When the officer took the phone from the Owner and tried to speak with LANNI, LANNI—who had already attempted to intimidate the Owner by identifying himself as a member of the Gambino organized crime family—said, "Apologize to me," and repeated, "Beg for my forgiveness.  Beg for my forgiveness.  Beg for my forgiveness . . . Beg.  Beg.  Beg for my forgiveness.  Beg.  Beg.  Beg for my forgiveness.  Say, 'I'm sorry, Joe.'"

At approximately 12:00 a.m. on September 2, 2023—*i.e.*, approximately four hours after LANNI and Minsquero were asked to leave Roxy's Bar and Grille, approximately three and a half hours after LANNI attempted to buy a gasoline container, and approximately two and a half hours after the Owner demanded that the Owner "beg for [his] forgiveness"—the Owner walked out of Roxy's and into the parking lot, accompanied by the Spouse.  The Owner got into the driver's seat of a car while the Spouse stood outside the car talking with the Owner through the open driver's side window.  While the Owner and the Spouse were talking, a man got into the front passenger door of the Owner's car, punched the Owner in the head, put a knife to the Owner's neck, and threatened to kill the Owner.  The Spouse ran to help the Owner and was punched and knocked to the ground by a second man.  Both perpetrators then beat the Spouse while the Spouse was on the ground.  The man with the knife slashed the Owner's tires with the knife and pointed the knife at the Spouse before leaving on foot.

*RUGGIERO.*  RUGGIERO is an inducted member of the Gambino crime family with a long history of committing serious crimes—including witness tampering—in service of the criminal enterprise.  In 2008, RUGGIERO pleaded guilty in this District to conspiracy to commit murder in-aid-of racketeering, in violation of 18 U.S.C. § 1959(a)(5), for his role in a plot to murder someone in furtherance of the Gambino crime family.  For this crime, RUGGIERO was sentenced principally to 84 months' imprisonment.  *See United States v. Agate, et al.*, No. 08-CR-076 (JBW) (E.D.N.Y.).

While in federal prison, RUGGIERO committed the new crime of witness tampering on behalf of the Gambino crime family.  Specifically, RUGGIERO understood that a witness was going to testify against a Gambino family associate at another trial in this District. RUGGIERO engaged in conduct intended to intimidate the witness not to testify, including such

things as the defendant's asking the witness repeatedly about cooperation with the government; boasting about his close relationship with Gambino crime family boss John Gotti, Sr.; and informing the witness that he had shot a man in the chest. Ultimately, while together with the witness in their cell, the defendant made his hand into the shape of a gun, pointed it at the witness's head, and stated, in sum and substance: "you know how we take care of rats, we get up-close and personal." Around the same time, the defendant approached another inmate to see if that inmate would be willing to assault the witness. *See* Government Sentencing Letter, *United States v. Ruggiero*, No. 09-CR-135 (SJ) (E.D.N.Y.), ECF No. 416. For this new criminal conduct, RUGGIERO was convicted in this District of witness tampering, in violation of 18 U.S.C. § 1512(d)(1), and sentenced to thirty-six months' imprisonment.

*ZILIANI.* ZILIANI is an inducted member of the Bonanno crime family. He is charged with one act of extortion in this case and, as described above, led the brawl at 80 Washington Place, during which he brandished a firearm.

3.  Defendants APICELLA, AWAWDEH, EARNEST, GELARDO, ZHEN HU, MINUCCI, and STROUD Should Also Be Detained

In addition to the LCN-Member Defendants, defendants APICELLA, AWAWDEH, EARNEST, GELARDO, ZHEN HU, MINUCCI, and STROUD should also be detained.

Beyond the seriousness of the fraudulent scheme, the weight of the evidence, and the strong penalties they face—outlined above—defendants AWAWDEH, GELARDO, ZHEN HU, MINUCCI, and STROUD are each charged with committing serious crimes of violence. *See* 18 U.S.C. § 3142(g)(1) (directing court to consider "whether the offense is a crime of violence . . . or involves . . . a firearm"). Notably, defendants GELARDO and ZHEN HU used actual violence against extortion victims, and defendant MINUCCI participated in a gunpoint robbery that defendants STROUD and AWAWDEH orchestrated for their own gain. Given their demonstrated willingness to use actual and threatened violence against extortion victims and others, there is a substantial risk that, if allowed to remain at liberty, these defendants would attempt to intimidate or harm those believed to be witnesses in the government's case. *See* 18 U.S.C. § 3142(f)(2); *United States v. Madoff*, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of the evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

Further, the Court should also consider the following facts in determining that the nature and characteristics of these defendants weigh in favor of detention:

*APICELLA.* Although he has no criminal history, the government's investigation revealed that APICELLA has access to firearms and has expressed a willingness to use violence for his own gain, which raises a significant concern about his danger to the community and attempts to obstruct justice if he were released on bail. For example, below are messages that defendant APICELLA sent to defendant MINUCCI about "cracking . . . heads open":





    *AWAWDEH*.  As noted, AWAWDEH participated in an armed robbery conspiracy.  He has one prior felony conviction for laundering the proceeds of controlled substances, in violation of New York Penal Law § 470.10(1), for which he was sentenced in 2020 to a term of probation that expired on October 17, 2023.  He began commission of the instant offenses while still on probation, which raises serious concerns about AWAWDEH's ability to comply with any terms of release.  In June 2024, AWAWDEH was charged by complaint in this District with wire fraud conspiracy, in violation of 18 U.S.C. § 1349, for his role in a sports betting conspiracy.  He was later charged by indictment with the same offense.  The case remains pending, and AWAWDEH has been released on bail since his arrest in June 2024.  *See United States v. Awawdeh*, No. 24-CR-488 (LDH).

    Further, the government recovered a voice note recording, dated June 18, 2022, from co-conspirator ZHEN HU's cellphone.  In the recording, AWAWDEH threatened to shoot someone:

> I'm not giving nobody a dollar.  I said listen, I don't give a fuck.
> You do what you want, this, that, and the third.  And then he was
> like alright cool, I'm gonna start just telling people.  *And I sent him
> the picture of my gun*; of me holding it with a selfie and I said, "*I'm
> gonna fucking shoot you in your fucking kneecaps*."

This threat raises a substantial concern that AWAWDEH has access to firearms and would be a danger to the community and attempt to obstruct justice if released on bail.

    *EARNEST*.  EARNEST has multiple prior felony convictions, including prior felony convictions for burglary and robbery offenses committed in the 1990s.  In 2007, EARNEST pleaded guilty to conspiracy to distribute cocaine and marijuana, in violation of 21 U.S.C. § 846, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), in the Eastern District of Missouri, for which he was sentenced principally to 151 months' imprisonment.  According to the Bureau of Prisons, EARNEST was released from custody in February 2019—two months before he began participating in rigged poker games in April 2019.  EARNEST's commission of new crimes so soon after his release from prison raises a significant

concern that EARNEST will not abide by any conditions of release, including appearing in court as required.

*GELARDO*.  GELARDO is a Bonanno family associate who committed one violent extortion, among other criminal acts, in this case.  He has multiple prior felony convictions for violent crimes, including assaults and weapons possession.  In 2002, he was convicted of assault in the second degree, in violation of New York Penal Law § 120.05, and sentenced to one year's imprisonment.  In 2005, he was convicted of assault in the second degree in a Connecticut court and sentenced to a suspended sentence of five years' imprisonment.  He later violated probation in 2008.  In 2008, he was convicted of criminal possession of a weapon in the third degree, in violation of New York Penal Law § 265.02(1), for which he was sentenced to two-to-four years' imprisonment.

In addition, the government's investigation revealed that GELARDO has access to firearms, which raises a significant concern about his danger to the community and ability to obstruct justice if he were released on bail.

Finally, GELARDO has apparent means to flee, even though he has no known source of legitimate income.  The government has identified approximately $500,000 in a bank account owned by GELARDO.  Moreover, earlier this year, GELARDO made a down payment of approximately $100,000 to purchase a Lamborghini sport utility vehicle, for which GELARDO now makes monthly payments of approximately $5,000.  GELARDO also owns other luxury cars, including a Mercedes-Benz G-Class sport utility vehicle.

*ZHEN HU*.  As noted, ZHEN HU personally assaulted John Doe #5 for not paying him a poker debt, and ZHEN HU also participated in the conspiracy to extort John Doe #6.

*MINUCCI*.  MINUCCI personally participated in the gunpoint robbery that is the subject of the Hobbs Act robbery conspiracy charged in this case.  MINUCCI poses a serious danger to the community in light of his conduct in this case and his criminal history.  Notably, in 2006, MINUCCI was convicted after a jury trial of robbery in the first degree as a hate crime, robbery in the second degree as a hate crime, assault in the second degree as a hate crime, criminal possession of stolen property in the fifth degree (three counts), and criminal possession of a weapon in the fourth degree.  The convictions stemmed from an incident during which MINUCCI beat a Black man in the head with a baseball bat and, using the n-word, told the victim not to enter his (predominantly Italian-American) neighborhood.  *See People v. Minucci*, 891 N.Y.S.2d 436 (N.Y. App. Div. 2009); Corey Kilgannon, *Bat-Wielding Attacker Gets 15 Years for Hate Crime*, N.Y. Times, July 18, 2006, at B2.  For these crimes, MINUCCI was sentenced to an overall sentence of fifteen years' imprisonment.  He was released to parole supervision in 2018 and was discharged from parole in June 2021.  MINUCCI engaged in illegal gambling as early as March 2021, while still on parole, further demonstrating that detention is required to protect the community from MINUCCI's undeterred criminal conduct.

*STROUD*.  STROUD was a leader of the charged wire fraud conspiracy who personally participated in many of the rigged poker games across the country.  As a leader of the conspiracy, he also directed the gunpoint robbery described above.  Further, STROUD has a

prior felony conviction for reckless homicide in Louisville, Kentucky, for which he was sentenced to three years' imprisonment in 1995.

### 4. Home Detention with Electronic Monitoring Would Be Insufficient for These Defendants

Finally, home detention with electronic monitoring would be insufficient to protect the community against these defendants, who are a clear danger to the community, and to mitigate the risk of flight. In *United States v. Millan*, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted); *see also Orena*, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology" (internal citation and quotation marks omitted). Notably, in *United States v. Dono*, where the prior pretrial detention of a defendant who had committed an armed assault was at issue, the Second Circuit rejected conditions that included, among others, home detention and electronic monitoring, and requirement that the defendant's father—a retired police officer—take "personal responsibility" for defendant. *See* 275 F. App'x 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008); *see also United States v. Masotto*, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").[7]

---

[7]    Recent history in this District demonstrates that numerous defendants have fled or otherwise attempted to thwart electronic monitoring after being released on bail. *See United States v. Franco*, No. 23-CR-394 (DG) (in July 2025 defendant absconded, failing to appear for two court appearances in advance of trial); *United States v. Neseosupe*, No. 19-CR-424 (FB) (in June 2025 defendant convicted at trial of receiving child pornography cut his location monitoring device and fled the day he was scheduled to begin serving his sentence and remains at large); *United States v. Cruz-Rodriguez*, No. 23-CR-224 (JS) (in May 2025 defendant charged with illegal reentry by a convicted felon cut his electronic monitoring device, left it on his front lawn, and absconded); *United States v. Elianor*, No. 16-CR-288 (AMD) (in March 2025 defendant fled after being arraigned on a violation of supervised release for attacking a witness who had previously testified against him in a state murder trial and remains at large); *United States v. Shen*, No. 25-CR-48 (HG) (in January 2025 defendant cut her electronic monitoring device at JFK Airport the day before she was required to surrender to the Bureau of Prisons); *United States v. Dali*, No. 24-MJ-645 (JAM) (in December 2024 defendant cut her location monitoring device while on pretrial release and absconded to Canada, where she was apprehended at the border);

*United States v. Pastor*, No. 15-CR-8 (MKB) (between September and November 2024 defendant with pending VOSR relating to state firearms offense cut his electronic monitoring device twice; after failing to appear at a hearing to address the second cutting incident, the defendant fled, threw another electronic monitoring device in the river and was only apprehended when he was arrested by the NYPD on separate charges); *United States v. Jicha*, No. 23-CR-342 (OEM) (in October 2024 defendant charged with securities fraud and associated crimes cut his location monitoring device while on pretrial release and absconded days before he was supposed to appear for a status conference and remains at large); *United States v. Symby*, No. 18-CR-480 (MKB) (in June 2024 defendant serving a term of supervised release following Hobbs Act robbery and Section 924(c) convictions absconded while on location monitoring after repeatedly violating the conditions of his release; arrested 12 months later in the District of Connecticut); *United States v. Clanton*, No. 23-CR-328 (KAM) (in March 2024 defendant fled after cutting his location monitoring device on the eve of trial); *United States v. Barker*, No. 23-MJ-27 (SIL) (defendant in an extradition proceeding tampered with his location monitoring bracelet on two occasions before he was remanded in December 2023); *United States v. Tripp*, No. 22-CR-336 (MKB) (in June 2023 defendant absconded instead of appearing at a bond revocation hearing and was only located after being arrested for a domestic violence incident); *United States v. Deloatch*, No. 21-CR-457 (ENV) (in June 2023 defendant charged with Hobbs Act robbery cut his location monitoring device and fled in advance of a bail revocation hearing); *United States v. Cox*, No. 23-CR-133 (RPK) (in August 2023 defendant charged with methamphetamine trafficking was released on bond following her arrest in California so she could attend an in-patient drug treatment program pending her removal to the Eastern District of New York; instead, she absconded from the treatment facility after two days and was not rearrested for five months); *United States v. Rodriguez*, No. 21-CR-329 (GRB) (in September 2022 defendant charged with illegal reentry by a convicted felon absconded); *United States v. Macario*, No. 22-CR-342 (HG) (in August 2022 defendant charged with fraud absconded after removing his location monitoring device and discarding it on the subway tracks moments after being released to attend drug treatment); *United States v. Lacatis*, No. 22-CR-190 (BMC) (in July 2022 defendant, a Romanian national involved in a fraud conspiracy, was released on bond following his arrest in California and ordered to report to the Eastern District of New York; instead, he cut his location monitoring device and fled); *United States v. Bartell*, No. 22-CR-80 (EK) (in May 2022 defendant charged with multiple bank robberies cut his location monitoring device and absconded within one week of being released on bail due to medical issues); *United States v. Baron*, No. 21-CR-307 (NGG) (in May 2022 defendant charged with narcotics trafficking and COVID fraud cut his location monitoring device and fled the jurisdiction approximately one hour before his scheduled change-of-plea hearing; arrested five months later in the Northern District of Georgia); *United States v. Ceasar*, Nos. 22-CR-459, 19-CR-117, 17-CR-048 (KAM) (in August 2021 defendant cut her electronic monitoring device and tried to flee the country after the Second Circuit ordered her resentenced and the government discovered evidence of her violation of release conditions); *United States v. Artis*, No. 20-CR-409 (PKC) (in June 2021 defendant released following a violation of his supervised release conditions cut his location monitoring device and failed to appear at bail revocation hearing); *United States v. May*, No. 19-CR-539 (FB) (in January 2021 defendant charged with armed robbery absconded while on home detention and remains at large).

B.    All Other Defendants Should Be Released with Substantial Bail Conditions to Assure the Safety of the Community and Their Appearance in Court as Required

For many of the same reasons outlined above, each of the factors set forth at 18 U.S.C. § 3142(g) weigh in favor of setting substantial bail conditions to ensure that the remaining defendants do not flee or engage in further criminal conduct.

First, as noted above, the offense conduct is serious. It involved sophisticated means to defraud numerous victims of millions of dollars across the country, and then to launder the proceeds of those crimes.

Second, the defendants pose a continuing danger to the community, in that there is a risk that they will continue to engage in fraud, illegal gambling, and money laundering given the significant profits earned by their schemes.

Third, as set forth above, the evidence against the defendants is extremely strong, which increases the probability of conviction and, therefore, gives them an incentive to flee or obstruct justice.

---

Even historically, a number of additional defendants have absconded after being charged with serious crimes, and many remain fugitives to this day. *See, e.g.*, *United States v. Riddle*, No. 17-CR-491 (JS) (in August 2019 defendant released on bond cut her location monitoring device and did not appear for bond violation hearing); *United States v. Whidbee*, No. 06-CR-759 (NGG) (in October 2018 defendant who had been convicted of possessing a firearm as an armed career criminal absconded from post release supervision); *United States v. Foskey*, No. 16-CR-332 (FB) (in September 2017 defendant charged with being a felon in possession of a firearm cut his location monitoring device and absconded awaiting trial; apprehended five weeks later in Pennsylvania during car stop having assumed a false identity); *United States v. Tavera*, No. 14-CR-338 (WFK) (in August 2015 defendant cut his location monitoring device and absconded); *United States v. Blake*, No. 14-CR-312 (CBA) (in July 2014 defendant charged with passport fraud failed to appear for a bail hearing scheduled following the defendant's guilty plea and was at liberty for approximately seven weeks); *United States v. Pughe*, No. 08-CR-737 (CBA) (in June 2014 defendant absconded instead of appearing for supervised release violation hearing and when he was arrested, he was in possession of ammunition in a car with a machete, marijuana, a knife, and additional ammunition); *United States v. Castillo*, No. 11-CR-108 (SLT) (in May 2013 defendant failed to appear for sentencing hearing); *United States v. Narzikulov*, No. 13-CR-601 (RJD) (in October 2013 defendant cut his electronic monitoring device days after being released on bail); *United States v. Mota*, No. 11-CR-438 (JBW) (in June 2012 defendant failed to appear for sentencing hearing); *United States v. Fernandez*, No. 10-CR-443 (DLI) (in March 2011 defendant texted his wife "sorry" and then absconded); *United States v. Doku*, No. 10-CR-358 (ENV) (in July 2010 defendant charged with narcotics trafficking failed to appear for sentencing hearing); *United States v. Tzolov*, No. 08-CR-370 (JBW) (in May 2009 defendant in fraud scheme attempted to flee to Spain while on location monitoring); *United States v. Qualls*, No. 07-CR-14 (DLI) (in November 2008 fraud defendant fled to Canada with a false passport shortly before jury began deliberations).

Fourth, in assessing the nature and characteristics of the defendants, the Court should consider the following facts about these defendants. *See* 18 U.S.C. § 3142(g)(3)(A) (directing courts to consider, among other factors, the defendant's "financial resources," "past conduct," and "criminal history").

*ALVAREZ*. ALVAREZ has one prior felony conviction. In 2002, he pleaded guilty to committing a Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), in this District, for which he was ultimately sentenced to a term of probation.

*BILLUPS*. BILLUPS has substantial financial resources. As an NBA player from 1997 to 2013, his lifetime career earnings exceeded $100 million, and he currently has a multi-year contract to serve as the head coach of the Portland Trail Blazers for an undisclosed salary.

*GALLO*. GALLO has one prior felony conviction. In 2014, he pleaded guilty to attempted enterprise corruption, in violation of New York Penal Law § 460.20(1)(a); attempted criminal usury, in violation of New York Penal Law § 190.42; and promoting gambling in the first degree, in violation of New York Penal Law § 225.10(1), for which he was sentenced to one year's imprisonment.

*HAN*. HAN has one prior conviction. In 2008, he was convicted of theft by unlawful taking, in violation of New Jersey Revised Statutes § 2C:20-3(a).

*HENNEN*. HENNEN has prior criminal convictions, including a prior federal conviction for possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841, for which he was sentenced to thirty months' imprisonment in 2011 in the United States District Court for the Western District of Pennsylvania; and aggravated assault, for which he was sentenced to eighteen months' imprisonment in 2011 in a Pennsylvania state court. In addition, HENNEN is currently charged by complaint with separate violations of 18 U.S.C. §§ 1349 (wire fraud conspiracy) and 1956(h) (money laundering conspiracy), relating to his role in a separate scheme to "fix" the performance of certain professional athletes in order to make profitable bets on the athlete's performance.

*HOTI*. HOTI has two prior felony convictions for possession of a controlled substance in New Jersey in 2022 and 2023, respectively. He also has a prior felony conviction for robbery in New Jersey in 2001.

*HORATIO HU*. In June 2025, HORATIO HU was charged in Queens County Criminal Court with misdemeanor assault and harassment charges, which remain pending.

*JONES*. JONES has substantial financial resources. As an NBA player from 1998 to 2009, he reportedly earned more than $20 million. After his retirement from the NBA, he has worked as an NBA coach and analyst.

*MEEKS*. MEEKS has prior convictions for gambling and possessing gambling equipment, among other offenses. Notably, he was convicted of bail jumping and failure to appear, in violation of Texas Penal Code § 38.10, in 2015. More recently, in October 2024, he was convicted of forgery of a financial instrument, a felony in violation of Texas Penal Code § 32.21(d).

*RENZULLI*.  RENZULLI has a prior conviction for promoting gambling in the second degree, in violation of New York Penal Law § 225.05.

*TRUSTMAN*.  TRUSTMAN has two prior felony convictions.  In 2010, he was sentenced to twenty-one months' imprisonment in the United States District Court for the Southern District of New York, following his guilty plea to racketeering, in violation of 18 U.S.C. § 1962(c), racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), and two counts of illegal gambling, in violation of 18 U.S.C. § 1955.  In 2019, he was convicted of criminal usury and enterprise corruption, in violation of New York Penal Law §§ 190.42 and 460.20, for which he was sentenced to three years' imprisonment.

*SHNAYDERMAN*.  SHNAYDERMAN has a prior conviction for petit larceny in New York in 2006.  He also has significant assets, including multiple bank accounts in the names of various limited liability companies and ten properties that he owns either individually, jointly, or through a limited liability company: one in Williamsburg, Brooklyn, one in Midtown East, Manhattan, and eight in Florida.  Most recently, in September 2025, SHNAYDERMAN purchased a property in Brooklyn for over $2 million.

In light of the above, the government submits that the Court should release the above-described defendants only if they satisfy appropriate conditions, including:

(1)    A substantial, secured bond of a value constituting a significant portion of the defendant's assets, secured by property, and/or signed by at least two sureties with net worths of sufficient unencumbered value to pay the amount of the bond, with appropriate moral suasion over the defendant, *see Sabhnani*, 493 F.3d at 77; *Batista*, 163 F. Supp. 2d at 224; *see also* 18 U.S.C. § 3142(c)(1)(B)(xii) (requiring that any surety "have a net worth which shall have sufficient unencumbered value to pay the amount of the bail bond");

(2)    For certain defendants who pose a particular risk of flight given their assets and access to money and resources, such as SHNAYDERMAN, a curfew with location monitoring;

(3)    Travel restrictions limiting the defendant's travel to the judicial district in which he or she resides and, as required for court appearances, New York City, *see* 18 U.S.C. § 3142(c)(1)(B)(iv);

(4)    A condition to surrender any passport to Pretrial Servies, and not to obtain any new passport or international travel document;

(5)    A condition prohibiting the transfer of assets valued at or greater than $10,000 without permission from the Court;

(6)    A condition prohibiting the defendants from engaging in any form of gambling, including but not limited to in-person and online poker games;

      (7)    A condition forbidding all contact with co-defendants, co-conspirators, any alleged victims of the crimes, and members of La Cosa Nostra, *see* 18 U.S.C. § 3142(c)(1)(B)(v); and

      (8)    A condition prohibiting the defendant from possessing a firearm, destructive device, or other dangerous weapon, *see* 18 U.S.C. § 3142(c)(1)(B)(viii).

## IV.    Conclusion

For the reasons set forth above, the government respectfully submits that defendants ERNEST AIELLO, LOUIS APICELLA, AMMAR AWAWDEH, MATTHEW DADDINO, LEE FAMA, THOMAS GELARDO, ZHEN HU, JOSEPH LANNI, NICHOLAS MINUCCI, ANGELO RUGGIERO, JR., ROBERT STROUD, and JULIUS ZILIANI should be detained pending trial, and that the Court impose appropriate conditions of release as to all other defendants to reasonably assure their appearance in court and the safety of other persons and the community.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:             /s/
           Michael W. Gibaldi
           Sean M. Sherman
           Irisa Chen
           Assistant U.S. Attorneys
           (718) 254-7000

cc:    Clerk of the Court (RER) (by ECF)
       Counsel of Record (by ECF and E-Mail)
       United States Pretrial Services (by E-Mail)

# APPENDIX A

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| ERNEST AIELLO | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three) | Detention | pp. 9-11, 18-21 |
| NELSON ALVAREZ | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5-7, 30 |
| LOUIS APICELLA | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Detention | pp. 5, 18-21, 24-25 |
| AMMAR AWAWDEH | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act robbery conspiracy – John Doe #7, in violation of 18 U.S.C. § 1951(a) (Count Six) | Detention | pp. 5, 8-10, 13-14, 16, 18-20, 24-25 |
| SAUL BECHER | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act extortion conspiracy – John Doe #6, in violation of 18 U.S.C. § 1951(a) (Count Seven) | Release with a substantial bail package | pp. 5, 9-10, 15-16 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| CHAUNCEY BILLUPS | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 7-8, 30 |
| MATTHEW DADDINO | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Detention | pp. 10, 14, 18-21 |
| ERIC EARNEST | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Detention | pp. 5, 7-8, 18-20, 25-26 |
| LEE FAMA | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two) | Detention | pp. 10-11, 18-21 |
| JOHN GALLO | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 10-11, 15, 30 |
| MARCO GARZON | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 8 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| THOMAS GELARDO | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act extortion conspiracy – John Doe #5, in violation of 18 U.S.C. § 1951(a) (Count Five) | Detention | pp. 9-10, 12, 16, 18-20, 24, 26 |
| JAMIE GILET | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5-8 |
| TONY GOODSON | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5-6, 8 |
| KENNY HAN | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5-7, 30 |
| SHANE HENNEN | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 3-5, 10, 13-14, 30 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| OSMAN HOTI | • Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three) <br> • Hobbs Act robbery conspiracy – John Doe #7, in violation of 18 U.S.C. § 1951(a) (Count Six) | Release with a substantial bail package | pp. 9, 13, 30 |
| HORATIO HU | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One) <br> • Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 30 |
| ZHEN HU | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One) <br> • Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three) <br> • Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) <br> • Hobbs Act extortion conspiracy – John Doe #5, in violation of 18 U.S.C. § 1951(a) (Count Five) <br> • Hobbs Act extortion conspiracy – John Doe #6, in violation of 18 U.S.C. § 1951(a) (Count Seven) | Detention | pp. 5, 9, 11-12, 15-17, 18-20, 24-26 |
| DAMON JONES | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One) <br> • Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 8-9, 30 |
| JOSEPH LANNI | • Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two) | Detention | pp. 10, 18-23 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| JOHN MAZZOLA | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act robbery conspiracy – John Doe #7, in violation of 18 U.S.C. § 1951(a) (Count Six) | Release with a substantial bail package | pp. 5-6, 13 |
| CURTIS MEEKS | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 30 |
| NICHOLAS MINUCCI | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act robbery conspiracy – John Doe #7, in violation of 18 U.S.C. § 1951(a) (Count Six) | Detention | pp. 5, 13-15, 18-20, 24, 26 |
| MICHAEL RENZULLI | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5-6, 31 |
| ANGELO RUGGIERO, JR. | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Washington Place, in violation of 18 U.S.C. § 1955(a) (Count Two) | Detention | pp. 5, 10, 18-21, 23-24 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| ANTHONY SHNAYDERMAN | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 17, 31 |
| ROBERT STROUD | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act robbery conspiracy – John Doe #7, in violation of 18 U.S.C. § 1951(a) (Count Six) | Detention | pp. 2, 4-8, 13-14, 18-20, 24-27 |
| SETH TRUSTMAN | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act extortion conspiracy – John Doe #6, in violation of 18 U.S.C. § 1951(a) (Count Seven) | Release with a substantial bail package | pp. 5, 9-11, 15, 31 |
| SOPHIA WEI | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four) | Release with a substantial bail package | pp. 5, 7 |

| Defendant | Charges | Position as to Detention | Pages Mentioned |
|---|---|---|---|
| JULIUS ZILIANI | • Wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One)<br>• Illegal gambling – Lexington Avenue, in violation of 18 U.S.C. § 1955(a) (Count Three)<br>• Money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Four)<br>• Hobbs Act extortion conspiracy – John Doe #5, in violation of 18 U.S.C. § 1951(a) (Count Five) | Detention | pp. 9-12, 16, 18-21, 24 |